## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VINCENT LYNCH, on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>vs.<br><br>WILMINGTON TRUST CORPORATION, TED T. CECALA, DONALD E. FOLEY, DAVID R. GIBSON, KEVYN N. RAKOWSKI, and ROBERT V.A. HARRA JR.<br><br>                Defendants. | Case No.:<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Vincent Lynch ("Plaintiff"), by his attorneys, on behalf of himself and all others similarly situated, alleges the following based upon the investigation of Plaintiff's counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Wilmington Trust Corporation ("Wilmington Trust" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media and news reports about the Company, and other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Wilmington Trust common stock.

### INTRODUCTION

1.     This is a securities class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) & 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of a class of all persons and entities who purchased or otherwise acquired the securities of Wilmington Trust between April

18, 2008 and November 1, 2010 inclusive (the "Class Period") to recover damages caused by Defendants' violations of the securities laws.

2.     Wilmington Trust is a financial holding company that provides a full range of banking and other financial services through its banking and other subsidiaries. Wilmington Trust has more than $10 billion in assets. Wilmington Trust has three core businesses: Regional Banking, which provides banking services throughout the Mid-Atlantic region[1], Corporate Client Services, and Wealth Advisory Services.

3.     Wilmington Trust makes loans to both commercial and consumer clients. Throughout the Class Period, loans accounted for more than 75% of Wilmington Trust's assets. Approximately three-quarters of Wilmington Trust's loan portfolio during the Class Period consisted of commercial loans, with a large concentration of the Company's loans related to developers building in Delaware.

4.     Throughout the Class Period, Wilmington Trust misrepresented the true extent of the deterioration in its loan portfolio in press releases and its quarterly and annual filings with the Securities and Exchange Commission ("SEC") by failing to adequately reserve for loan losses.

5.     Even after the sudden departure of the Company's Chairman and Chief Executive Officer on June 3, 2010 and the subsequent news in June 2010 that Wilmington Trust had hired a third party to perform a detailed loan review in preparation for an upcoming regulatory exam by the Federal Reserve scheduled for July 2010, investors and analysts continued to be misled as to the true impairment of the Company's loan portfolio.

---

[1] The Company defines the Mid-Atlantic region as Delaware and the parts of Maryland, New Jersey, and Pennsylvania within 150 miles of the Company's Wilmington, Delaware headquarters.

6.     Throughout the Class Period, Wilmington Trust performed an internal risk rating analysis quarterly, classifying all loans outstanding into one of four categories of risk.  The four categories of risk are:

> • Pass: Loans with no current or potential problems.
>
> • Watchlist: Accruing loans that are potentially problematic.
>
> • Substandard: Accruing or nonaccruing loans with identified weaknesses and some probability of loss.
>
> • Doubtful/loss: Nonaccruing loans with a high probability of loss, or which we have charged off.

7.     Accordingly, "non pass" loans include those that are among the watchlist, substandard or doubtful/loss rated loans. Throughout the Class Period, the quality of Wilmington Trust's loan portfolio significantly deteriorated:

| Non pass loans as a percentage of total loans for the quarter ended: | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/31/08 | 6/30/08 | 9/30/08 | 12/31/08 | 3/31/09 | 6/30/09 | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 |
| 4.38% | 3.72% | 3.92% | 9.2% | 11.4% | 13.53% | 16.14% | 18.71% | 20.69% | 26.7% | 35.5% |

However, Wilmington Trust failed to adequately reserve for losses associated with the increasing non pass loans.

8.     On November 1, 2010, Wilmington Trust shocked investors when it issued two related press releases.  First, Wilmington Trust announced dismal results for the third quarter of 2010, reporting a loss of $365.3 million due in part to an additional $281.5 million loan loss provision and a $100.7 million income tax expense associated with a valuation allowance against the Company's deferred tax asset.  The Company stated that a primary cause for the loss was continued deterioration in the Company's loan portfolio, reflecting the extent of the Company's exposure to real estate construction lending concentrated in Delaware.  Wilmington Trust further stated that it had "little assurance" that its loan portfolio would strengthen significantly in the near term, or that the Company's capital position would not erode further.  Second, Wilmington

Trust announced that it would merge with M&T Bank Corporation ("M&T") and that the two companies had already signed a definitive agreement. Under the terms of the merger agreement, Wilmington Trust common shareholders will receive 0.051372 shares of M&T common stock in exchange for each share of Wilmington Trust common stock. At this conversion ratio, the transaction valued each Wilmington Trust common share at a mere $3.84 per share representing what the Company claimed was the tangible book value as of September 30, 2010 despite the fact that Wilmington Trust shares had closed at $7.11 per share on October 29, 2010, the last trading day before this announcement.

9.      On the ensuing conference call also held on November 1, 2010, an executive from M&T stated that the estimated total fair value of Wilmington Trust's loan portfolio was only one billion dollars, or 13% of loans, and also disclosed that estimated future credit losses remaining in the Wilmington Trust loan portfolio would also be $1 billion.

10.     Upon the release of the November 1, 2010 news, shares of the Company's common stock fell $2.90 per share, or more than 40%, to close on November 1, 2010 at $4.21 per share, on unusually heavy trading volume.

11.     A November 27, 2010 Wall Street Journal article explained that, over the summer, examiners from the Federal Reserve "discovered that [Wilmington Trust] wasn't writing down the value of loans made to borrowers whose real-estate projects had stumbled . . . [and] that the bank was relying on appraisals that were several years old." The article also noted that "nonperforming loans at Wilmington Trust jumped 77% to $988.6 million in the third quarter [of 2010] from the end of June."

12.     Throughout the Class Period, the Company represented that it was adequately reserving for loan losses and reporting its financial results in accordance with generally accepted

accounting principles ("GAAP"). However, unknown to investors as alleged below, during the Class Period, Wilmington Trust knowingly or recklessly failed to disclose that (1) its loan portfolio was impaired to a much larger extent than the Company had disclosed, (2) the Company had failed to properly record losses for its impaired assets by adequately provisioning for loan losses each quarter in light of its known concentrations of loans in the commercial sector and in the struggling Delaware region, and that as result of the foregoing, (3) the Company's financial statements were materially false and misleading and not prepared in accordance with GAAP, including overstating the value of the Company's assets, understating its provisions for loan losses and understating the Company's income tax expense; and (4) Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and growth.

## JURISDICTION AND VENUE

13.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States. Venue is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c) as many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Wilmington Trust's principal executive offices are located within this District, and the Company is incorporated in this District.

14.     In connection with the facts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

15.    Plaintiff purchased Wilmington Trust common stock as detailed in the certification attached hereto and was damaged thereby.

16.    Defendant Wilmington Trust is a Delaware corporation and a financial holding company that provides a full range of banking and other financial services through its banking and other subsidiaries. The Company is headquartered in Wilmington, Delaware and its stock trades on the New York Stock Exchange ("NYSE") under the symbol "WL".

17.    Ted T. Cecala ("Cecala") was Wilmington Trust's Chief Executive Officer ("CEO") and Chairman of the Board from 1996 until he announced his retirement, effective immediately for the CEO position, on June 3, 2010.  Cecala stayed on as Chairman of the Board until July 19, 2010.  Defendant Cecala, among other things, signed the Company's quarterly reports on Form 10-Q for the periods ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009, June 30, 2009, September 30, 2009 and March 31, 2010, the Annual Reports filed on Form 10-K for the periods ended December 31, 2008 and December 31, 2009 and multiple certifications pursuant to the Sarbanes-Oxley Act of 2002 as alleged in ¶¶ 32, 35, 39, 44, 49, 53, 58, 63, and 71 below.

18.    Donald E. Foley ("Foley") was a Director of Wilmington Trust throughout the Class Period, and succeeded Cecala as CEO from June 3, 2010 through the end of the Class Period.  Foley signed the Company's SEC filings during the Class Period after assuming the role of CEO.  In his role as a director, Defendant Foley, among other things, signed the Company's Annual Reports filed on Form 10-K for the periods ended December 31, 2008 and December 31, 2009, and as CEO signed the Company's quarterly report on Form 10-Q for the period ended

June 30, 2010, and a certification pursuant to the Sarbanes-Oxley Act of 2002 as alleged in ¶ 86 below.

19.     David R. Gibson ("Gibson") has been Executive Vice President and Chief Financial Officer ("CFO") of the Company since 2002.  Gibson signed the Company's annual and quarterly reports filed with the SEC throughout the Class Period. Defendant Gibson, among other things, signed the Company's quarterly reports on Form 10-Q for the periods ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009, June 30, 2009, September 30, 2009, March 31, 2010, June 30, 2010 and September 30, 2010, the Annual Reports filed on Form 10-K for the periods ended December 31, 2008 and December 31, 2009, and multiple certifications pursuant to the Sarbanes-Oxley Act of 2002 as alleged in ¶¶ 32, 35, 39, 44, 49, 53, 58, 63, 71, and 86 below.

20.     Kevyn N. Rakowski ("Rakowski") has been Controller and a Senior Vice President of the Company since 2006. Defendant Rakowski signed the Company's Annual Reports filed on Form 10-K for the periods ended December 31, 2008 and December 31, 2009.

21.     Robert V.A. Harra Jr. ("Harra") was during the Class Period, and signed the Annual Reports filed on Form 10-K for the periods ended December 31, 2008 and December 31, 2009.  Harra was also President and Chief Operating Officer of Wilmington Trust throughout the Class Period.

22.     Wilmington Trust, Cecala, Foley, and Gibson together are referred to herein as the "Wilmington Defendants."

23.     Defendants Cecala, Foley, Gibson, Rakowski and Harra together are referred to herein as the "Officer Defendants."

**RELEVANT NON-PARTIES**

24.     Non-party M&T is headquartered in Buffalo, New York and is a bank holding company. Its stock trades on the NYSE under the symbol "MTB".

25.     Rene F. Jones is an Executive Vice President and CFO of M&T.     Jones participated in the conference call held by Wilmington Trust following the announcement of the acquisition of Wilmington Trust by M&T.

**CLASS ACTION ALLEGATIONS**

26.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased the publicly traded common stock of Wilmington Trust between April 18, 2008 and November 1, 2010, inclusive (the "Class").

27.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at the present time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members of the Class located throughout the United States.  As of September 30, 2010, Wilmington Trust had 91,483,687 shares of common stock issued and outstanding.

28.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein. Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

30.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)     whether defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and the proper measure of such damages.

**False and Misleading Statements**

31.     The Class Period begins on April 18, 2008 when Wilmington Trust announced its financial results for the first quarter ended March 31, 2008:

Wilmington, Del., April 18, 2008 – Wilmington Trust Corporation (NYSE: WL) reported today that earnings for the 2008 first quarter were $0.62 per share (on a diluted basis), the same as for the year-ago first quarter. Net income for the 2008 first quarter was $41.4 million, compared to $43.0 million for the year-ago first quarter.

"Significant loan growth, solid growth in Corporate Client Services and Wealth Advisory Services revenue, and stable credit quality were offset by a decline in net interest income due to the market interest rate environment," said Ted T. Cecala, Wilmington Trust's chairman and chief executive officer. "Our first quarter results demonstrate, once again, how our diversified business mix helps us generate consistent results, even in the face of a challenging interest rate environment."

*          *          *

**Loan portfolio**

• Loans totaling more than $321 million were added during the first three months of 2008, the largest three-month increase since the first quarter of 2006.

• Most of this growth was in the commercial portfolio. Commercial loan balances topped $6 billion for the first time (on a period-end basis). On average, commercial balances reached $5.94 billion, which was 8% higher than for the year-ago first quarter, and 4% higher than for the 2007 fourth quarter.

• Within the commercial portfolio, most of the growth was in commercial mortgage loans and commercial and industrial loans (recorded as commercial, financial, and agricultural loans).

*     *     *

**Credit quality in the 2008 first quarter**

• In the internal risk rating analysis, 96% of total loans outstanding had pass ratings.

• Compared to the 2007 fourth quarter:

• Loan balances were $321.6 million higher (on a period-end basis).

• At $4.7 million, net charge-offs were $5.0 million lower and the net charge-off ratio was 7 basis points lower.

32.     On May 12, 2008, Wilmington Trust filed a quarterly report for the first quarter of 2008 on Form 10-Q ("First Quarter 2008 10-Q"), reporting substantially the same financial information as set forth in the April 18, 2008 press release. The First Quarter 2008 10-Q states that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry." The Third Quarter 2009 10-Q includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cecala and Gibson, whereby each of the signatories certified to the following:

> 1. I have reviewed this quarterly report on Form 10-Q of Wilmington Trust Corporation;

10

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to

the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

33.    The First Quarter 2008 10-Q also states in part:

**THE REGIONAL BANKING BUSINESS**

The Regional Banking business continued to benefit from the well-diversified economy in the mid-Atlantic region, which has not experienced the level of economic downturn seen in some other parts of the United States. Credit quality . . . remained stable.

Total loans outstanding rose 4% in the first three months of 2008. This was the largest three-month increase since the first quarter of 2006. Approximately two-thirds of this growth was in the commercial portfolio and approximately one-third was in the consumer portfolio.

                              *       *       *

*Commercial Loans*

Commercial loan balances exceeded $6.0 billion for the first time, as we added $219.2 million of commercial loans during the first three months of 2008. This was an increase of 4% from year-end 2007.

                              *       *       *

We have a high degree of confidence in the integrity of our commercial construction portfolio, because:

• We focus on clients with privately held or family-owned businesses. We do not lend to large, national homebuilders.

• The geographic scope of our commercial lending activity is concentrated in the mid-Atlantic region. This region has not experienced the volume of speculative over-building seen in other parts of the United States. Generally, projects we fund are within a two-hour drive from our headquarters in Wilmington, Delaware.

• Most of the construction loans in our portfolio are for single-family homes in residential tract developments. Population growth is driving the demand for housing and related services.

• We apply our underwriting standards consistently.

*     *     *

At March 31, 2008, loans accounted for 75% of our assets, and most of our asset quality remained tied to loan, or credit, quality.

34.     On July 18, 2008, Wilmington Trust announced its financial results for the second quarter ended June 30, 2008:

Wilmington, Del., July 18, 2008 — Wilmington Trust Corporation (NYSE: WL) reported a loss of $19.5 million, or $0.29 per share, for the 2008 second quarter.

*     *     *

Wilmington Trust's capital position remained strong. All regulatory capital ratios continued to exceed the amounts required by the Federal Reserve Board to be considered a well-capitalized institution.

*     *     *

**Significant factors in second quarter 2008 results**

• The Regional Banking business added $483.0 million of loans during the 2008 second quarter. This was the largest three-month increase in the company's history. Loan balances topped $9 billion for the first time, on both a period-end and average-balance basis. Loan growth reflected the resilience of the well-diversified economy in the mid-Atlantic region, which has not experienced the levels of unemployment and housing pressure seen in some other parts of the United States.

*     *     *

**Credit quality in the 2008 second quarter**

No negative systemic credit quality trends emerged during the second quarter, but the combination of loan growth and downgrades in the internal risk rating analysis caused the provision and reserve for loan losses to increase.

Total nonperforming assets increased to $88.5 million from $77.7 million at March 31, 2008. Three credits — a commercial construction loan, a loan to a retailer, and a loan to a textile manufacturer — accounted for the majority of this

$10.8 million increase. The nonperforming asset ratio was 95 basis points, the same as at year-end 2007.

\*       \*       \*

Given the unpredictability of commercial loan charge-offs, management does not believe the 2008 second quarter net charge-off ratio indicates a trend, and expects the net charge-off ratio to remain within its historical range of 24 to 31 basis points over a 12-month period.

\*       \*       \*

The percentage of loans with pass ratings in the internal risk rating analysis improved to 96.28% from 95.62% at March 31, 2008, largely due to loan growth.

On a percentage basis, the composition of the loan portfolio remained well diversified and relatively unchanged. Additional disclosures about credit quality appear in the financial statement section of this release.

35.     On August 11, 2008, Wilmington Trust filed a Form 10-Q for the second quarter ended June 30, 2008 (the "Second Quarter 2008 10-Q") reporting substantially the same financial information as set forth in the July 18, 2008 press release. The Second Quarter 2008 10-Q states that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry." The Second Quarter 2008 10-Q includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cecala and Gibson, whereby each of the signatories certified to substantially the same statements alleged in ¶ 32 above.

36.     The Second Quarter 2008 10-Q states that loans account for 76% of Wilmington Trust's total assets.

37.     The Second Quarter 2008 10-Q also states, in part:

**THE REGIONAL BANKING BUSINESS**

The Regional Banking business continued to benefit from the well-diversified economy in the mid-Atlantic region, which has not experienced the level of economic downturn seen in some other parts of the United States. While the

provision for loan losses rose, its increase did not result from any new or negative systemic trends in the regional economy or our portfolio.

*     *     *

### Commercial Loans

Commercial loan balances, which exceeded $6.0 billion for the first time in the 2008 first quarter, reached $6.36 billion at June 30, 2008. This was 9% higher than at year-end 2007.

*     *     *

### Commercial construction loans

Commercial construction balances continued to increase, albeit at a much slower pace than in prior periods, and were 4% higher than at year-end 2007. At $1.85 billion, commercial construction loans accounted for 20% of total loans at June 30, 2008, down from 21% at year-end 2007. Most of the loans in the portfolio continued to be for residential construction, primarily for single-family homes, in Delaware.

*     *     *

We have a high degree of confidence in our commercial construction portfolio and its integrity, because:

• We focus on clients with privately held or family-owned businesses that are well established and successful. We do not lend to large, national homebuilders.

• The geographic scope of our commercial lending activity is concentrated in the mid-Atlantic region. This region has not experienced the volume of speculative over-building seen in other parts of the United States. Generally, projects we fund are within a two-hour drive from our headquarters in Wilmington, Delaware.

• Most of the construction loans in our portfolio are for single-family homes in residential tract developments. Population growth is driving the demand for this type of housing and related services. We do very little condominium construction or conversion financing.

• We apply our underwriting standards consistently.

*     *     *

### LOAN LOSS RESERVE AND LOAN LOSS PROVISION

The provision and the reserve for loan losses rose due to the substantial growth in loan balances, higher levels of nonperforming assets, downgrades in the internal

risk rating analysis, and charge-offs. The provision for loan losses increased from $10.0 million for the 2008 first quarter to $18.5 million for the 2008 second quarter.

\*     \*     \*

We reserve an amount for loan losses that represents our best estimate of known and inherent estimated losses and we make subjective judgments about amounts we might be able to recover.

38.     On October 17, 2008, the Company announced its financial results for the third

quarter ended September 30, 2008:

Wilmington, Del., October 17, 2008 — Wilmington Trust Corporation (NYSE: WL) reported net income of $22.9 million for the 2008 third quarter, or $0.34 per share (on a diluted basis). . . .

\*     \*     \*

**Regional Banking**

• The Regional Banking business continued to benefit from economic conditions in the mid-Atlantic region, where unemployment rates remained below the U.S. average. Delaware's unemployment rate for August 2008 (the most recent data available) was 4.9%, compared with the U.S. average of 6.1%. The August unemployment rate was 5.8% for Pennsylvania, 5.9% for New Jersey, and 4.5% for Maryland.

• Loan balances, on average, were $9.46 billion. This was 15% higher than for the year-ago third quarter, and 4% higher than for the 2008 second quarter.

• At period-end, loan balances were $9.59 billion, up 15% year-over-year and up 3% from the 2008 second quarter. The Delaware market accounted for approximately 54% of total period-end loans; the Pennsylvania market accounted for approximately 24%; and the Maryland market accounted for approximately 10%.

• Commercial loan balances were $6.55 billion, on average, for the 2008 third quarter. This was 17% higher than for the year-ago third quarter, and 5% higher than for the 2008 second quarter. At period-end, commercial loan balances were $6.67 billion. The Delaware market accounted for approximately 55% of commercial loans at period-end; the Pennsylvania market accounted for approximately 27%; and the Maryland market accounted for approximately 9%.

\*     \*     \*

**Credit quality in the 2008 third quarter**

Compared to the 2008 second quarter, net charge-offs decreased, but nonperforming asset levels increased. The combination of this increase and loan growth, plus risk rating downgrades, caused the provision and reserve for loan losses to increase. The percentage of loans with pass ratings in the internal risk rating analysis remained at 96%.

The provision for loan losses was $19.6 million, up from $18.5 million for the 2008 second quarter. The reserve for loan losses increased to $122.2 million from $113.1 million at June 30, 2008. The loan loss reserve ratio increased 5 basis points from the 2008 second quarter to 1.27%.

39.     On November 10, 2008, Wilmington Trust filed a Form 10-Q for the third quarter ended September 30, 2008 (the "Third Quarter 2008 10-Q") reporting substantially the same financial information as set forth in the October 17, 2008 press release. The Third Quarter 2008 10-Q states that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry." The Third Quarter 2008 10-Q includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cecala and Gibson, whereby each of the signatories certified to substantially the same statements alleged in ¶ 32 above.

40.     The Third Quarter 2008 10-Q also states, in part:

**THE REGIONAL BANKING BUSINESS**

The Regional Banking business continued to benefit from the well-diversified economy in the mid-Atlantic region, which has not experienced the level of economic downturn seen in some other parts of the United States.

*           *           *

*Loans*

Total loans were $9.59 billion at September 30, 2008, which was 13% higher than at year-end 2007.

*           *           *

*Commercial Loans*

We added $835.9 million of commercial loans during the first nine months of 2008, an increase of 14% from year-end 2007. Commercial loan balances, which exceeded $6 billion for the first time in the 2008 first quarter, were $6.67 billion at September 30, 2008. C&I loans accounted for 44% of the year-to-date growth in total commercial loans, commercial mortgage loans accounted for 40%, and commercial construction loans accounted for 16%. All of our mid-Atlantic markets contributed to the commercial loan growth.

*     *     *

*Commercial construction loans*

The pace of growth in commercial construction loans slowed throughout the first nine months of 2008, as housing markets softened from their levels in 2006 and the first half of 2007. At $1.91 billion, commercial construction balances were 7% higher than at year-end 2007, and accounted for 20% of the total loan portfolio (commercial and retail loans combined). Most of our commercial construction loans continued to be for residential construction projects, primarily for single-family homes, in Delaware.

*     *     *

We have a high degree of confidence in our commercial construction portfolio and its integrity, because:

• We focus on clients with privately held or family-owned businesses that are well established and successful. We do not lend to large, national homebuilders.

• The geographic scope of our commercial lending activity is concentrated in the mid-Atlantic region. This region has not experienced the volume of speculative over-building seen in other parts of the United States. Generally, projects we fund are within a two-hour drive from our headquarters in Wilmington, Delaware.

• Most of the construction loans in our portfolio are for single-family homes in residential tract developments. Population growth is driving the demand for this type of housing and related services.

• We apply our underwriting standards consistently.

*     *     *

At September 30, 2008, loans accounted for 79% of our assets, and most of our asset quality remained tied to loan, or credit, quality.

*     *     *

**LOAN LOSS RESERVE AND LOAN LOSS PROVISION**

The provision and the reserve for loan losses rose due to the substantial growth in loan balances, higher levels of nonperforming assets, downgrades in the internal risk rating analysis, and charge-offs. The provision for loan losses increased from $18.5 million for the 2008 second quarter to $19.6 million for the 2008 third quarter.

*     *     *

We reserve an amount for loan losses that represents our best estimate of known and inherent estimated losses and we make subjective judgments about amounts we might be able to recover. We also consider loan growth, the results of the internal risk rating analysis, the levels of loan recoveries and repayments, the stability of the mid-Atlantic regional economy, market interest rates, and regulatory guidelines.

41.     On December 12, 2008, Wilmington Trust entered into an agreement with the United States Department of the Treasury pursuant to the Treasury's Capital Purchase Program under the Troubled Asset Relief Program ("TARP"). Pursuant to this agreement, the Company received $330 million.

42.     On January 7, 2009, Wilmington Trust filed a Form 8-K with the SEC announcing that the Company expects to record an increase in its provision for loan losses for the fourth quarter of 2008. The Company states in the 8-K:

The Company expects to record a provision for loan losses of approximately $67 million for the 2008 fourth quarter. The expected increase reflects changes in the status of loans in the commercial and industrial, commercial real estate/construction, and consumer loan portfolios. It is caused by a variety of factors, most not determined until late in the quarter, including an economic environment that deteriorated rapidly, downgrades in internal risk ratings, reductions in appraised values, higher levels of charge-offs, and an increase in nonperforming loans.

43.     On January 30, 2009, Wilmington Trust announced its financial results for the fourth quarter and year ended December 31, 2008:

Wilmington, Del., January 30, 2009 — Wilmington Trust Corporation (NYSE: WL) reported a loss for the 2008 fourth quarter of $68.5 million, or $1.02 per share.

*       *       *

[One of the factors affecting fourth quarter results was:]

• An increase in the provision for loan losses, which rose from $19.6 million for the 2008 third quarter to $67.5 million for the 2008 fourth quarter. As disclosed on January 7, 2009, this increase was caused by changes in the status of commercial and consumer loans due to rapid deterioration in the mid-Atlantic regional economy, downgrades in internal risk ratings, reductions in appraised values, higher loan chargeoffs, and higher levels of nonperforming loans.

*       *       *

**Regional Banking**

In the Regional Banking business, loan balances exceeded $9.61 billion for the first time on both a period-end and average-balance basis.

On average, loan balances for the 2008 fourth quarter were 15% higher than for the year-ago fourth quarter, and up 2% from the 2008 third quarter. For the 2008 full year, average loan balances were 12% higher than for 2007.

Nearly all of the growth was in the commercial portfolio. On average, the company added $177.0 million of commercial loans during the 2008 fourth quarter. This generated a 17% increase in commercial balances, on average, from the year-ago fourth quarter, and a 3% increase from the 2008 third quarter.

*       *       *

**Credit quality**

The economy in the mid-Atlantic region remained well diversified, but economic conditions weakened in the 2008 fourth quarter, particularly in the housing market. In Delaware, the unemployment rate jumped to 6.2% in December, up from 5.6% in November and 3.5% in December 2007.

The economic deterioration caused nonaccruing loans, loans past due 90 days or more, and net charge-offs to increase from 2008 third quarter levels. These increases, combined with loan growth and downgrades in internal risk ratings, resulted in a higher provision and reserve for loan losses. The amounts recorded for renegotiated loans and other real estate owned were unchanged from the 2008 third quarter.

*       *       *

For the 2008 fourth quarter, the provision for loan losses was $67.5 million; for the 2008 full year, it was $115.5 million. In comparison, for 2007, the provision was $9.2 million for the fourth quarter and $28.2 million for the full year.

20

*     *     *

At December 31, 2008, the reserve for loan losses was $157.1 million, or 1.63% of total loans outstanding. In comparison, at September 30, 2008, the reserve was $122.2 million, or 1.27% of loans outstanding. At December 31, 2007, the reserve was $101.1 million, or 1.19% of loans outstanding.

On a percentage basis, the composition of the loan portfolio was the same as at September 30, 2008, and relatively unchanged from year-end 2007. . . .

44.     On March 2, 2009, Wilmington Trust filed a Form 10-K for the fourth quarter and year ended December 31, 2008 (the "2008 10-K") reporting substantially the same financial information as set forth in the January 30, 2009 press release. The 2008 10-K states that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry." The 2008 10-K includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cecala and Gibson, whereby each of the signatories certified to substantially the same statements alleged in ¶ 32 above.

45.     In a section of the 2008 10-K entitled "To Our Shareholders," Defendant Cecala states:

> The year 2008, however, was unlike anything in my experience. Market interest rates fell to historic lows, financial market volatility erased years of gains, capital markets froze, and consumer confidence stalled — simultaneously. Several venerable financial institutions failed, and the U.S. government took extraordinary measures to stabilize and bolster the economy.

*     *     *

> In the mid-Atlantic region, where we conduct our Regional Banking activities, the economy weakened throughout the first nine months of 2008 and then deteriorated rapidly in the fourth quarter. This environment created problems for some of our borrowers, and we raised our provision for loan losses to $115.5 million. To put that amount in context, consider that the 2007 provision was only $28.2 million.

46.     The 2008 10-K also states, in part:

21

**CREDIT QUALITY IN 2008 AND 2007**

**Economic conditions deteriorated in the mid-Atlantic region.** After softening in 2007 and the first nine months of 2008, the regional economy weakened significantly in the 2008 fourth quarter. More information about the regional economy is in the Regional Banking discussion in this report.

**The number of troubled credits in the portfolio increased, but remained at a manageable level.** These credits were spread across the commercial and consumer portfolios, and were not concentrated in any single loan category.

**In the internal risk rating analysis, the percentage of loans with pass ratings decreased to 90.80%.** Rating downgrades occurred in the commercial, construction-real estate, and commercial mortgage loan portfolios.

**We believe the increase in the number of troubled credits resulted from economic pressures, not underwriting inadequacies.** Likewise, favorable economic conditions in 2005 and 2007 were the main reason for the low levels of net charge-offs and the net charge-off ratio for those years.

47.     Further, the Company states in the 2008 10-K that "The provision and reserve for loan losses represent what we believe are reasonable assessments of our known, estimated, and inherent loan losses."

48.     On April 24, 2009, Wilmington Trust announced its financial results for the first quarter ended March 31, 2009:

> Wilmington, Del., April 24, 2009 — Wilmington Trust Corporation (NYSE: WL) reported net income of $21.8 million for the first quarter of 2009. Earnings per common share were $0.26 on a diluted basis.
>
> "All of our businesses did well in the first quarter, but extraordinary economic and market conditions prevented the full extent of these successes from translating into higher earnings," said Ted T. Cecala, Wilmington Trust chairman and chief executive officer. "Amid the current disruption in our industry, clients are increasingly attracted to our relationship focus and financial stability, but we are battling the interest rate environment, economic uncertainty, and market volatility."
>
>            \*        \*        \*
>
> Commercial loan balances totaled $6.72 billion, on average. This was $780.5 million higher than for the 2008 first quarter, but $12.8 million less than for the 2008 fourth quarter. On a linked-quarter basis, commercial and industrial loans (recorded as commercial, financial, and agricultural loans) decreased 4%,

commercial construction loans increased 1.5%, and commercial mortgage loans increased 4%, on average.

*    *    *

**Credit quality**

Total net charge-offs were $21.2 million, down from $25.5 million for the 2008 fourth quarter, as commercial construction, commercial mortgage, and retail net charge-offs all decreased. This brought the net charge-off ratio to 22 basis points, down from 27 basis points for the 2008 fourth quarter.

49.      On May 11, 2009, Wilmington Trust filed a Form 10-Q for the first quarter ended March 31, 2009 (the "First Quarter 2009 10-Q") reporting substantially the same financial information as set forth in the April 24, 2009 press release. The First Quarter 2009 10-Q states that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry." The First Quarter 2009 10-Q includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cecala and Gibson, whereby each of the signatories certified to substantially the same statements alleged in ¶ 32 above.

50.      According to the First Quarter 2009 10-Q, loans accounted for 82% of Wilmington Trust's total assets.

51.      The First Quarter 2009 10-Q also stated, in part:

**THE REGIONAL BANKING BUSINESS**

The Regional Banking business continued to benefit from the well-diversified economy in the mid-Atlantic region, which has not experienced the level of economic downturn seen in some other parts of the United States. The mid-Atlantic economy is broadly diversified among the life sciences, financial services, pharmaceutical, health care, education, construction, manufacturing, retail, agriculture, military, and tourism industry sectors. Historically, this diversification has provided a degree of economic stability and helped the region withstand the effects of a downturn in any single sector.

In the 2009 first quarter, the economic environment in the region was more stable than in the 2008 fourth quarter, but conditions remained fragile. In this

environment, loan balances decreased somewhat, core deposit balances rose 8%, and credit quality metrics were mixed. We discuss credit quality in more detail in the credit risk section of this report.

*     *     *

### Commercial lending

Total commercial loan balances decreased slightly during the first three months of 2009, as declines in commercial, financial, and agricultural (C&I) loans offset increases in commercial construction and commercial mortgage loan balances. The decline in C&I balances reflected client reticence amid uncertain economic conditions.

*     *     *

### Commercial construction lending

Commercial construction balances increased 2% during the first three months of 2009. Approximately one-third of this increase was for the refinancing of a successful strip shopping center in northern Delaware. Most of the rest was for land acquisition and development, primarily for residential projects in Delaware and southeastern Pennsylvania.

Shifts in the types of projects in the commercial construction portfolio reflected demand for retail and professional offices to support the increase in residential building in recent years, as well as Delaware's population growth.

### Commercial construction loan portfolio

Our exposure to the commercial real estate industry is limited to the mid-Atlantic region, which has experienced much less real estate market erosion than many other parts of the United States. We make construction and commercial mortgage loans to clients based in this region whose projects are located within this region. We lend to clients with well-established businesses that are family-owned or closely held. We do not lend to large, national homebuilders. Most of the loans in our commercial construction portfolio are for single-family residential developments in Delaware and southeastern Pennsylvania. We do very little condominium construction or conversion financing.

We have a high degree of confidence in our construction loan underwriting standards, which we apply consistently. In addition to the collateral provided by the project itself, we generally obtain personal guarantees from borrowers.

*     *     *

**Credit quality in the first three months of 2009**

Credit metrics were mixed for the 2009 first quarter. Net charge-offs and loans past due 90 days or more decreased from year-end 2008, but nonperforming asset levels increased. On a percentage basis, the composition of the loan portfolio was relatively unchanged.

\*       \*       \*

**Provision and reserve for loan losses**

The loan loss provision for the 2009 first quarter was $29.5 million, which was higher than for the 2008 first quarter, but $38 million, or 56%, less than for the 2008 fourth quarter.

The reserve for loan losses rose 6% from year-end 2008 to $167.0 million. This brought the loan loss reserve ratio to 1.77%, compared with 1.63% at year-end 2008.

\*       \*       \*

We reserve an amount for loan losses that represents our best estimate of known and inherent estimated losses and we make subjective judgments about amounts we might be able to recover. We also consider loan growth, the results of the internal risk rating analysis, the levels of loan recoveries and repayments, the stability of the mid-Atlantic regional economy, market interest rates, and regulatory guidelines.

52.     On Jul 24, 2009, Wilmington Trust announced its financial results for the second

quarter ended June 30, 2009:

Wilmington, Del., July 24, 2009 — Wilmington Trust Corporation (NYSE: WL) reported a loss of $9.1 million, or $0.20 per common share, for the second quarter of 2009.

\*       \*       \*

[One factor which reduced earnings was:]

• An increase in the provision for loan losses, which rose to $54.0 million from $29.5 million for the 2009 first quarter. This increase was driven by higher levels of nonperforming assets and net charge-offs, and downgrades in the internal risk rating analysis, as economic conditions in the mid-Atlantic region remained unsettled.

\*       \*       \*