**Regional Banking**

Total loan balances were $9.40 billion, on average. This was 3% higher than for the year-ago second quarter, and 1% lower than for the 2009 first quarter. Increases in commercial loan balances were offset somewhat by decreases in consumer loan balances.

Commercial loans accounted for 73% of the portfolio at period end, up from 69% at the end of the year-ago second quarter and 71% at the end of the 2009 first quarter. The company makes commercial loans throughout the mid-Atlantic region, but concentrates its consumer lending activities in the state of Delaware.

Commercial balances reached a record-high of $6.73 billion, on average. This was $469.9 million, or 8%, higher than for the year-ago second quarter, and $10.8 million more than for the 2009 first quarter.

*     *     *

**Credit quality**

The economic downturn has not been as severe in the mid-Atlantic region as in some other parts of the United States, but unsettled conditions continued to challenge some borrowers. These pressures led to increases in the reserve and provision for loan losses, as net charge-offs and nonperforming asset levels rose from prior periods. In addition, downgrades in the internal risk rating analysis reduced the percentage of pass-rated loans. The majority of the downgraded loans were commercial construction and commercial mortgage loans.

At June 30, 2009, the reserve for loan losses was $184.9 million, and the loan loss reserve ratio was 2.02%. In comparison, at March 31, 2009, the reserve was $167.0 million, and the loan loss reserve ratio was 1.77%.

53.     On August 10, 2009, Wilmington Trust filed a Form 10-Q for the second quarter ended June 30, 2009 (the "Second Quarter 2009 10-Q") reporting substantially the same financial information as set forth in the July 24, 2009 press release. The Second Quarter 2009 10-Q states that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry." The Second Quarter 2009 10-Q includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cecala and Gibson, whereby each of the signatories certified to substantially the same statements alleged in ¶ 32 above.

54.    The Second Quarter 2009 10-Q also states in part:

. . . [O]ur second quarter 2009 results were pressured by:

• The increase in the provision for loan losses, which rose to $54.0 million, up from $18.5 million for the year-ago second quarter, as economic conditions in the mid-Atlantic region remained unsettled. This increase was driven by higher levels of nonperforming assets and net charge-offs, and downgrades in the internal risk rating analysis.

\*         \*         \*

**THE REGIONAL BANKING BUSINESS**

The Regional Banking business is affected by the economy in the mid-Atlantic region, which is broadly diversified among the life sciences, financial services, pharmaceutical, health care, education, construction, manufacturing, retail, agriculture, military, and tourism industry sectors. Historically, this diversification has provided a degree of economic stability and helped the region withstand the effects of a downturn in any single sector.

To date, the economy in the mid-Atlantic region has not experienced the severity of economic downturn seen in some other parts of the United States. At June 30, 2009, Delaware's unemployment rate was 8.4%, lower than the U.S. rate of 9.5% (as reported by the Federal Reserve Bank of Philadelphia and the U.S. Bureau of Labor Statistics).

Economic improvements did not occur as rapidly in the 2009 second quarter as we had anticipated at the end of the 2009 first quarter, and economic conditions seemed stable, but fragile. Commercial and consumer loan balances decreased from their year-end 2008 levels; core deposit balances rose 14%; and credit quality deteriorated. We discuss credit quality in more detail in the credit risk section of this report.

\*         \*         \*

Commercial loans accounted for 73% of the total loan portfolio at June 30, 2009, up from 70% at year-end 2008 and 69% at June 30, 2008. This was due to declines in consumer loan balances, primarily in indirect auto loans, and to sales of residential mortgages.

\*         \*         \*

**Commercial construction and commercial mortgage lending**

Almost all of our exposure to the commercial real estate industry is limited to clients whose businesses are based in, and whose projects are located in, the mid-Atlantic region. We lend to clients with well-established businesses that are

family-owned or closely held. We do not lend to large, national homebuilders. Most of the loans in our commercial construction portfolio are for single-family residential developments in Delaware and southeastern Pennsylvania. We do very little condominium construction or conversion financing, and very little of our portfolio is associated with beachfront property.

The real estate market has been more stable in the mid-Atlantic region than in many other parts of the United States. We attribute this to:

• A relative lack of speculative building.

• Less rapid appreciation in property values, which has translated into milder declines in property values.

• Population growth that has kept demand for housing relatively high.

In the commercial construction portfolio, balances increased 2%, or $38.1 million, during the first six months of 2009. Approximately one-third of this increase was for the refinancing of a successful strip shopping center in northern Delaware. Most of the rest was for land acquisition and development, primarily for residential projects in Delaware and southeastern Pennsylvania.

At June 30, 2009, most commercial construction loans were for residential projects in Delaware. The increase in retail and office projects, on a percentage basis, reflected demand for services and amenities to support the growth of Delaware's population, and its housing market, in recent years. Most of the commercial office projects we fund are for low-rise professional office buildings, such as offices for medical, legal, and accounting practices, and for warehouses and other industrial uses.

*     *     *

## ASSET QUALITY, LOAN LOSS RESERVE, AND LOAN LOSS PROVISION

At June 30, 2009, loans accounted for 82% of our assets, and most of our asset quality remained tied to loan, or credit, quality.

*     *     *

We reserve an amount for loan losses that represents our best estimate of known and inherent estimated losses and we make subjective judgments about amounts we might be able to recover. We also consider loan growth, the results of the internal risk rating analysis, the levels of loan recoveries and repayments, the stability of the mid-Atlantic regional economy, market interest rates, and regulatory guidelines.

55.    On October 23, 2009 Wilmington Trust announced its financial results for the

third quarter ended September 30, 2009:

**WILMINGTON, Del. -- October 23, 2009**

Wilmington Trust Corporation (NYSE:WL) reported a loss of $5.9 million, or
$0.15 per diluted common share, for the third quarter of 2009. . . .

"The Corporate Client Services business recorded impressive revenue growth, the
provision for loan losses declined, the net interest margin improved, and there
were numerous other positive developments during the third quarter," said Ted T.
Cecala, Wilmington Trust chairman and chief executive officer. "Unfortunately,
recessionary pressures reduced the value of some of our investment securities and
triggered accounting rules that require us to write them down."

\*       \*       \*

**Credit quality**

Approximately 87% of total loans outstanding at September 30, 2009, were to
clients in Delaware, southeastern Pennsylvania, and Maryland, where the
economic downturn has not been as severe as in some other parts of the United
States. According to the *October 2009 Business Outlook Survey* published by the
Federal Reserve Bank of Philadelphia, trends suggest economic declines in the
region have moderated.

These conditions produced mixed credit quality metrics. Compared to the 2009
second quarter, the provision for loan losses as well as net charge-offs and the net
charge-off ratio were lower, while nonperforming assets and loans past due 90
days or more were higher.

The provision for loan losses was $38.7 million, which was 28% lower than the
$54.0 million recorded for the 2009 second quarter. The reserve for loan losses
was $201.8 million, up 9% from $184.9 million at June 30, 2009. The higher
reserve reflected additional downgrades in the internal risk rating analysis, plus
the increases in nonperforming assets and loans past due 90 days or more.

\*       \*       \*

"We prefer to work with borrowers to resolve repayment problems instead of
automatically charging off unpaid amounts. Consequently, loans may remain on
nonaccruing status for longer periods," Mr. Cecala said. "Compared to many
other banks, our nonperforming asset levels are typically higher, but our net
charge-offs are typically lower. We believe the net charge-off ratio is the most

meaningful measure of credit quality, and we believe our loan loss reserve is adequate."

Net charge-offs for the 2009 third quarter were $21.8 million, which was 40% less than the $36.2 million recorded for the 2009 second quarter. . . .

Nonperforming assets totaled $397.5 million, which was $67.2 million higher than at the end of the 2009 second quarter.

56.     Also on October 23, 2009, Wilmington Trust held a conference call.  In response to a statement from an analyst regarding migration between the internal risk rating categories that "it looks like you need to catch up [in terms of loan loss provisions], given what's happening to the portfolio internally," the Company responded, in part, as follows.

> Historically because of who we lent to and how we do business, and how we worked with folks that we know are not performing –as long as I've been here, has always run higher than our peers. At the end of the day, where the rubber meets the road, in terms of how much we get back or how much we don't get back there is always compared favorably to the folks we measure up against. . . . [T]here isn't always a direct correlation between bumping somebody we choose to put in nonperforming status relative to the ultimate collectability of a loan.

*     *     *

> "[G]enerally . . . anything that's going on substandard gets . . . a very close scrutiny and we will--based on the facts circumstances and size, we'll put specific reserves against those loans."

57.     During the October 23, 2009 conference call, Defendant Gibson also stated that "I think the key to us is making sure that we have appropriate reserves against those loans and I think we do."

58.     On November 9, 2009, Wilmington Trust filed a quarterly report for the third quarter of 2009 on Form 10-Q ("Third Quarter 2009 10-Q"), reporting substantially the same financial information as set forth in the October 23, 2009 press release.  The Third Quarter 2009 10-Q states that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices

prescribed for the banking industry." The Third Quarter 2009 10-Q includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cecala and Gibson, whereby each of the signatories certified to substantially the same statements alleged in ¶ 32 above.

59.    The Third Quarter 2009 10-Q also states that loans account for 83% of Wilmington Trust's total assets, that fifty four percent of Wilmington Trust's commercial loans are concentrated in Delaware, and that the "Delaware market continued to account for the majority of total loans outstanding in the third quarter" of 2009. Additionally, the Third Quarter 10-Q went on to refer to "fragile economic conditions in the Mid-Atlantic" and that Regional Banking has the most exposure to economic risk, specifically "risk tied to economic conditions within the mid-Atlantic region, where our Regional Banking business is focused." Despite these "fragile" economic conditions and increased risk in the geographic region where the Company's loan activities were most concentrated, as noted above, in the third quarter of 2009 Wilmington Trust only reported a $38.7 million provision for loan losses, which was a 28% decrease over the prior quarter.

60.    On January 29, 2010, Wilmington Trust announced its financial results for the fourth quarter and fiscal year ended December 31, 2009:

**WILMINGTON, Del. -- January 29, 2010**

Wilmington Trust Corporation (NYSE:WL) reported a loss of $11.2 million for the 2009 fourth quarter and a loss of $4.4 million for the 2009 full year. . . .

\*        \*        \*

**Credit quality**

Most of the trailing-quarter changes in net charge-offs, nonperforming loans, internal risk ratings, and other credit quality metrics were associated with commercial construction loans, primarily for residential land and construction projects in Delaware. Many of these changes reflected declines in collateral valuations.

"Delaware was among the 20 fastest-growing states in each of the past three years, and that population growth drove the increase in our commercial construction loan balances," Mr. Cecala said. "Given the downturn in the housing market, it is no surprise that most of the deterioration we have seen in credit quality has been associated with construction borrowers in Delaware.

\*       \*       \*

For the 2009 fourth quarter, the provision for loan losses was $82.8 million, compared with $38.7 million for the trailing quarter. For the 2009 full year, the provision was $205.0 million, compared with $115.5 million for 2008.

At December 31, 2009, the reserve for loan losses was $251.5 million, compared with $201.8 million at September 30, 2009, and $157.1 million at the end of 2008. The loan loss reserve ratio rose to 2.80%, compared with 2.24% at September 30, 2009, and 1.63% at the end of 2008.

More than half of the increases in the provision and reserve for loan losses were associated with commercial construction loans in Delaware.

61.    According to the January 29, 2010 press release, the Company reported a loss of $11.2 million, or $0.23 per share on a fully diluted basis, for the fourth quarter 2009, and a loss of $4.4 million, or $0.33 per share on a fully diluted basis, for the 2009 full year. One of the main factors contributing to these results were "[i]ncreases in the provision for loan losses, which reduced net interest income. The provision reflected higher levels of nonperforming loans and charge-offs, as well as risk rating downgrades, primarily in the commercial construction portfolio."

62.    Also on January 29, 2010, Wilmington Trust held a conference call. On the call, Defendant Cecala stated that the Company "continued to see pressure in the Delaware housing market."

63.    On February 22, 2010, Wilmington Trust filed a Form 10-K for the fourth quarter and year ended December 31, 2009 (the "2009 10-K") reporting substantially the same financial information as set forth in the January 29, 2010 press release. The 2009 10-K states that "[w]e

maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry." The 2009 10-K includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cecala and Gibson, whereby each of the signatories certified to substantially the same statements alleged in ¶ 32 above.

64.     The 2009 10-K also states, in part, as follows:

There were many positive developments at our company in 2009. Our capital position remained strong, we continued to attract new clients as well as more business from existing clients, and we kept a tight rein on expenses. . . .

These successes were not strong enough, however, to counter the recessionary pressures that affected all of our businesses, reduced revenue, and resulted in a net loss for the year of $4.4 million. After dividends and accretion on the preferred stock we issued to the U.S. Department of the Treasury in conjunction with our participation in the Capital Purchase Program (CPP), the 2009 net loss available to common shareholders was $22.7 million. The chief factors in this loss were:

• **An increase in the provision for loan losses, which reduced net interest income.** This increase reflected higher levels of nonperforming loans and loan losses, as sluggish economic conditions continued to pressure commercial borrowers, especially in Delaware. The provision was $205.0 million for 2009, up from $115.5 million for 2008. . . .

\*       \*       \*

Economic conditions in the mid-Atlantic region remained challenging. There were pockets of improvement, but they were uneven, and there were few indications that abroad recovery was underway.

\*       \*       \*

CREDIT QUALITY IN 2009 AND 2008

The economy in 2009 was slow to rebound from the sharp decline in activity that occurred late in 2008. Some pockets of stability were evident as 2009 progressed, but conditions remained uneven. In particular, the mid-Atlantic region, where our Regional Banking business is focused, generally has fared better than other parts of the United States, but it has not been immune to the effects of the economic downturn. In 2009, the protracted nature of this recession pressured borrowers and led to an increase in the number of troubled credits.

The effect of the economy's extended weakness was evident in our 2009 credit metrics. Compared to 2008, the percentage of credits with pass ratings declined. In addition, levels of nonperforming assets and net charge-offs increased, while loans past due 90 days or more declined modestly. Commercial construction loans accounted for approximately 50% of the increase in troubled credits.

We believe the increase in troubled credits resulted primarily from economic pressures.

65.     The 2009 10-K also stated the following regarding loan loss reserves and loan

loss provisions:

The reserve and provision for loan losses increased in 2009 primarily because of deterioration in the quality of the commercial real estate construction portfolio. The loan loss reserve ratio for 2009 was 2.80%, compared with 1.63% for 2008. The 2009 provision for loan losses was $205.0 million, up from $115.5 million for 2008.

The loan loss reserve and provision represent what we believe are reasonable assessments of our known, estimated, and inherent loan losses. . . .

*       *       *

We believe our process provides the best estimate of required reserves at each reporting date. The process we use to calculate the reserve has provided an appropriate reserve over an extended period of time, and we believe that our methodology is sound.

66.     On April 23, 2010, Wilmington Trust announced its financial results for the first

quarter ended March 31, 2010:

**WILMINGTON, Del. -- April 23, 2010**

Wilmington Trust Corporation (NYSE:WL) reported a loss of $29.2 million for the 2010 first quarter. After dividends and accretion on preferred stock, the net loss available to common shareholders was $33.8 million. On a fully diluted basis, the net loss available to common shareholders was $0.44 per share.

*       *       *

. . .Nonperforming assets were higher than for the 2009 fourth quarter, but the increase was the smallest since the 2008 third quarter. Net charge-offs and the net charge-off ratio were lower than for the 2009 fourth quarter.

Despite these positive trends, economic conditions in Delaware are improving more slowly than elsewhere in the mid-Atlantic region. Due to uncertainty about the pace of Delaware's recovery, as well as credit risk rating downgrades, management added $48.3 million to the reserve for loan losses and recorded a provision for loan losses of $77.4 million. The amount of the provision, coupled with $18.0 million of investment securities impairment charges, reduced revenue and resulted in a net loss for the quarter.

. . ."These positives were muted by the reserve and provision for loan losses, which we increased because Delaware's economy is lagging the improvements seen elsewhere in the United States. While there are some encouraging signs, they are uneven and not broad-based."

**Credit quality**

Nonperforming assets increased during the 2010 first quarter, but the increase was the lowest since the 2008 third quarter. Compared to the trailing quarter, the reserve for loan losses was higher, while the provision for loan losses, net charge-offs, and the net charge-off ratio were lower.

Nonaccruing loans were $468.9 million at March 31, 2010, which was $13.3 million higher than at year-end 2009. Nonaccruing commercial real estate/construction loans decreased, while other categories of nonaccruing loans increased.

Most of the increase in nonaccruing loans was in commercial mortgage loans, which rose $14.3 million in the 2010 first quarter.

\*       \*       \*

Nonperforming commercial real estate/construction loans decreased $18.0 million during the 2010 first quarter. Charge-offs accounted for approximately $12.1 million of this decrease. The remainder reflected transfers to other real estate owned (OREO).

67.    Also on April 23, 2009, Wilmington Trust held a conference call. On the call,

Defendant Gibson represented, in part, as follows:

While we believe that our region will perform better than the rest of the country, we still see pockets of weakness, rather than broad-based recovery. It appears that parts of New Jersey and Pennsylvania in our banking footprint have shown improvement, but that has not occurred to the same extent in Delaware, where we have the greatest exposure to real estate. . . . [T]he growth of our problem credits appeared to have moderated somewhat this quarter, but we cannot conclude that this is a trend. Criticized assets continued to grow during the quarter, and we increased the reserve by $48 million. Reserve to loan ratio increased to 3.44%,

35

from 2.80% at year-end. Non-accruing loans rose $13 million. And overall, non-performing assets increased $32 million due to increases in OREO and restructured credits. This is the smallest increase in NPAs [non-performing assets] since the third quarter of 2008.

68.    Defendant Cecala added, "while we see signs that Delaware's economy may be stabilizing, we remain cautious about the near term outlook."

69.    In response to questions from Macquarie Capital Markets analyst Tom Alonso's about what is holding back the Delaware economy, Defendant Cecala answered that

It's a function of a couple of things. One, it went into this recession a little later than other parts of the country. So far for us, we have always been very proud of the fact that we had a dominant market share of the commercial banking business in Delaware, and that obviously is going to hold that back, a little bit in terms of the recovery. We just need to have some more consistent performance. We've seen some pockets that look very encouraging, but at the same time we just can't declare any victory whatsoever.

70.    On April 26, 2010, Janney Capital Markets issued an equity research note stating "[w]e remain concerned that Wilmington Trust will have to increase reserves in future quarters as the amount appears inadequate relative to non-performing loans and potential problem loans."

71.    On May 10, 2010, Wilmington Trust filed its quarterly report for the first quarter 2010 on Form 10-Q with the SEC ("First Quarter 2010 10-Q") reporting substantially the same financial information as set forth in the April 23, 2010 press release. The First Quarter 2010 10-Q states that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry." The First Quarter 2010 10-Q includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cecala and Gibson, whereby each of the signatories certified to the same statements alleged in ¶ 32 above.

72.    Among other things, the First Quarter 2010 10-Q stated as follows:

Economic conditions in the mid-Atlantic region remained mixed. Despite some improving trends, economic conditions in Delaware are improving more slowly

than elsewhere in the mid-Atlantic region, and remained uncertain. The severity and duration of the recession continued to affect loan balances and our credit metrics during the 2010 first quarter.

*       *       *

Nonperforming assets increased during the 2010 first quarter, as did loans past due 90 days or more. The provision for loan losses, net charge-offs, and the net charge-off ratio, although higher than the 2009 first quarter, were all lower than for the 2009 fourth quarter. Despite some positive trends in the economy, economic conditions in Delaware are improving more slowly than elsewhere in the mid-Atlantic region.

*       *       *

A combination of risk rating downgrades, higher nonperforming loans, and continued uncertainty in parts of the mid-Atlantic economy, led to increases in both the reserve and provision for loan losses. The reserve for loan loss as a percentage of total loans was 3.44% at March 31, 2010, compared to 2.80% at year-end 2009, while the provision for loan losses was $77.4 million for the 2010 first quarter, compared to $29.5 million for the prior year first quarter.

73.     On June 4, 2010, the day after the Company announced Defendant Cecala's retirement from his position as CEO effective immediately on June 3, 2010, the Company held a conference call to address questions about the change in management and continued to make false and misleading statements in response to analyst questions as to whether the Company was adequately provisioning for loan losses. In this regard, Justin Maurer, a Lord Abbett analyst, asked:

> [R]elative to the last couple of quarters of taking extra provision and credit quality being as such, you guys have talked more recently about feeling like unemployment level has leveled off some, you're feeling better in the last couple of months about things, that you didn't want to be surprised again from a credit perspective. Can you sit here today and kind of reassure us that those variables are still in place given the news that we're talking about today?

In response, Defendant Foley stated:

> Well, the economy continues to improve and right now it's a little early to give you any prediction. . . . we're just at the beginning of June so its hard to predict, but we are, as all the economic statistics point out, we are seeing some positive things occur.

37

74.    On June 7, 2010, RBC Capital Markets issued a research report in light of the change in management at Wilmington Trust. RBC stated that "[w]e still remain hopeful that the credit tide has finally turned for the Company; however, the manner in which the recent change in management occurred has raised our concerns as to the factors that brought about the change."

## THE TRUTH BEGINS TO EMERGE

75.    On June 23, 2010, SunTrust Robinson Humphrey issued a research report downgrading the Company's stock following a field trip with the Company's management whereby SunTrust Robinson Humphrey learned that the quality of Wilmington Trust's loan portfolio, after having undergone a third party review, was worse than previously disclosed. The SunTrust Robinson Humphrey report stated, in part:

> WL recently hired a third party firm to perform a detailed loan review in preparation for the company's upcoming regulatory exam. It appears the review will result in deteriorating credit metrics as the company attempts to more aggressively deal with its credit challenges. We also expect NCOs [net charge offs] to pick up materially in the near term. While we applaud a more aggressive credit stance, the results were likely not incorporated in our or Street estimates.

76.    Following the issuance of this research report, the price of Wilmington Trust stock declined approximately 11%, on very heavy trading volume, as a portion of the artificial inflation came out of Wilmington's stock price.

77.    On June 24, 2010, RBC Capital Markets issued a research report also commenting that the Company has hired an independent credit review firm, which RBC believes will find "much higher than anticipated credit deterioration, particularly in the construction loan portfolio" and "will discover inadequacies in the company's loan loss reserving methodology, outdated appraisals and optimistic credit loss assumptions." RBC's report concluded that "[t]he road will be very bumpy through the remainder of the year but we believe the market has already 'baked' in large credit losses for the company."

78.     On July 23, 2010, Wilmington Trust announced its financial results for the second

quarter ended June 30, 2010:

**WILMINGTON, Del. -- July 23, 2010**

Wilmington Trust Corporation (NYSE: WL) reported a loss of $116.4 million for
the 2010 second quarter. After dividends and accretion on preferred stock, the net
loss available to common shareholders was $120.9 million, or $1.33 per share.

The primary cause of the loss was the amount of the provision for loan losses,
which rose to $205.2 million, following increases in nonperforming loans, loan
charge-offs, and loans with unfavorable risk ratings. Other contributing factors
were $18.8 million of credit-related expenses and $7.7 million of securities losses.

The negative trends in credit reflected continuing economic pressures, particularly
in southern Delaware, that weakened the financial condition of some borrowers
and caused commercial real estate valuations to decline significantly.
Management's assessment of these factors and economic conditions overall led to
an increase in the reserve for loan losses and other actions to reduce risk in the
loan portfolio.

"My priority is to return our company to profitability and position our businesses
for future growth, but first we must continue to deal with the lingering effects of a
weak economy and housing market. Our second quarter results demonstrate we
are doing that," said Donald E. Foley, Wilmington Trust's chairman and chief
executive officer. "We are fully committed to working through our credit issues,
relying on robust risk management tools and analyses.

                              *        *        *

**CHARGE-OFFS**

The financial condition of some borrowers weakened in the second quarter,
especially in southern Delaware, where signs of economic recovery remain
tentative. In addition, updated real estate appraisals received during the quarter
revealed significant declines in collateral valuations. These factors led
management to increase loan loss estimates, charge off more loans, downgrade
risk ratings, and add $74.0 million to the reserve for loan losses.

                              *        *        *

Commercial real estate/construction loans accounted for approximately two-thirds
of the trailing quarter increase in net charge-offs. Most of these loans were for
residential projects in southern Delaware, and largely for parcels of land in
various stages of development.

    \*      \*      \*

"In addition to increasing the loan loss reserve, lowering risk ratings, and recognizing losses, we made management changes in the lending and credit review areas, added loan work-out staff, and continued aggressive work-out strategies. Also, to validate our own examination of the portfolio, we engaged an independent third-party credit review firm to take an objective look at our policies, procedures, and risk ratings, and their review and analysis supported our conclusions," Mr. Foley said. "It is difficult to predict how quickly the economy and collateral values will stabilize and allow us to put these problems behind us. In the meantime, our rigorous scrutiny of credit risk continues."

79.     Also on July 23, 2010, Wilmington Trust held a conference call.  During the call, Defendant Foley explained that the provision for loan losses rose to $205 million, from $77 million recorded in the prior quarter, due to economic pressures particularly in southern Delaware, where real estate appraisals showed severe reductions in collateral valuations and where updated financial records from the Company's borrowers showed significant weakening in the wake of the prolonged recession. Additionally, Foley talked at length about Wilmington Trust's credit issues.  He stated, in part:

I can assure you that the negative trends in our credit metrics have my full attention. What I would like to do this morning is talk about what happened in the second quarter, what we're doing about it, and where we think we're headed.

Our sense is that the economic downturn hit Delaware later than it hit other areas. And it appears that our recovery will likewise lag the improvements seen elsewhere. To date, while Delaware's unemployment rate began to abate somewhat, we still have not seen any widespread sign of economic improvement.

Throughout the second quarter, appraisals continued to reflect significant declines, and collateral evaluations became more severe. And the financial condition of some of our borrowers continued to weaken. Our evaluation of these indicators increased our estimates of potential loan losses, and led us to take decisive action in recognizing losses, classifying loans in the internal risk rating analysis, and increasing the reserve for loan losses.

Our recognition of losses resulted in $135 million of charge-offs in the second quarter, compared with $31 million in the first quarter. After recoveries, net charge-offs for the second quarter were $131 million, more than 4 times higher than that of the first quarter. The net charge-off ratio went from 33 basis points for

the first quarter to 153 basis points for the second quarter. Bringing it to 6% on an annualized basis.

Nearly two-thirds of the loans we charged off in the second quarter were commercial real estate construction loans. Most of these loans were for projects in Southern Delaware for parcels of land that are in various stages of development. In the internal risk rating analysis, loans with watch list ratings increased $92 million, and loans with sub-standard classifications increased $362 million. As you know, the sub-standard classification includes accruing as well as non-accruing loans, and approximately 92% of the increase in sub-standard loans were loans that continue to accrue interest. Of the $362 million increase, $166.3 million was for commercial, financial and agricultural loans, $149.1 million was for commercial real estate construction loans, and $48.3 million were for commercial mortgage loans. Consumer and other retail loans with substandard ratings decreased by $1.5 million in the second quarter.

Obviously, the risk rating downgrades and charge-off trends were critical factors in our loan loss reserve calculation. In addition, we looked at trends in loans, past due 90 days or more, as well as non-accruing loans. And even with the high degree of charge-offs, non-accruing loans continued to increase. We charged off $119 million of non-accruing loans in the second quarter, but the inflow of new non-accruing loans was $130 million. Of these new non-accruing loans, approximately half were in commercial real estate and construction loans, approximately 25% were commercial, financial and agricultural loans and approximately 25% were commercial mortgage loans. More than half of the commercial mortgage loans in our portfolio are for properties located in Delaware and more than half of the loans in the portfolio are for owner-occupied properties. Those properties are mainly low rise office buildings that house medical practice, law offices, accounting firms and other professional services.

*       *       *

Regarding the reserve calculation, all of these negative trends along with some qualitative judgments were made, and led us to add $74 million to the loan loss reserve.

This brought the reserve to $374 million, as I said before, 4.46% of total loans outstanding. In comparison, the loan loss reserve ratio for the first quarter was 3.44%.

I want to be very clear about what happened with credit in the second quarter. Our methodology for evaluating credit risk did not change in the second quarter. What changed were the data points supporting our evaluation. We saw a substantial amount of negative data, like the magnitude of declines in collateral valuation, the negative trends in the financial conditions of some of our borrower, the lack of widespread economic improvement in Delaware, and the increases in loans past