due 90 days or more, and non-accruing loans. In other words, the data points changed our conclusion. It was not our methodology.

So, while our methodology remain the same, there have been changes in some of the ways we think about credit risk.

For example, we know that we need to watch some of the credits more closely and we have to look at some of them for frequently. In addition we have taken steps to help us manage and reduce credit risk. We have added staff, made management changes, tightened underwriting standards, and taken other actions.

80.     On the same call, following these remarks, and in response to a question from an analyst at Suntrust Robinson Humphrey about the risk that the increased amount of watchlist and substandard loans would flow into non-accrual, Defendant Gibson asserted "I think we are reserving appropriately given that risk."

81.     Moreover, during the July 23 conference call, when defendant Foley explained that the commercial construction loans for single family development projects in Delaware were responsible for the much of the decline in the valuation of the Company's loan portfolio, one analyst said "Well, hasn't that turned down a long time ago?"

82.     Also during the July 23 conference call, another analyst asked about the deferred tax asset and how investors could get comfortable that auditors are not going to make the Company write it down next quarter, stating that the Company is in a "three-year cum[ulative]-loss position." In response, Gibson answered, "I think we have lots of positive evidence in terms of our business model, and future prospects for operating income. . . . [T]he largest negative thing that would happen is if we would have a large loss. And at this point, I am not going to say that is or not going to happen . . ." In response and astonishment to Gibson's comment, the analyst pointed out that the Company was continuing its pattern of misleading statements in the face of deteriorating credit trends, and the following conversation ensued:

42

&lt;Q&gt;: So I'm just wondering how – so you're saying hopefully you don't have another large loss, but I mean the credit's going the wrong way. I mean we could easily have this quarter again next quarter and two quarters, no?

&lt;A - David Gibson&gt;: I think that's a pretty simple analysis, though I think on a complex question. I think the substandard accruing credits, we essentially have doubled our allocation of reserve to those substandard loans based on appraisal. So...

&lt;Q&gt;: You've got to remember, though, that people have been asking this question since you guys did the capital raise, and even a month ago when Ted left, everybody asked you if credit was okay, and you said we're fine, we're fine, we're fine. And then you come out with this $140 million loss, whatever it is, and that's why people are going back and saying why can't you have more losses when your reserves are still only 25% of your substandard loans? You guys don't see that?

&lt;A - David Gibson&gt;: Casey, all I can point to is that we've done a very rigorous job at pushing these valuations through our process.

83.    Despite the skepticism of analysts, at the close of the July 23 call, Defendant Gibson stated "we wanted to make sure that you understood that Wilmington Trust is a fundamentally strong institution" and "[w]hile no one can predict when the economy will turn for the better, we believe we can manage the credit challenges effectively over the coming months, and begin to position the company to capitalize fully on its many strengths."

84.    An analyst report issued on July 23, 2010 by Janney Capital Markets indicated that Wilmington Trust still had not fully disclosed the true impairment of its loan portfolio by stating "[w]e remain concerned that Wilmington Trust will have to increase reserves in future quarters as the amount appears light relative to non-performing loans and potential problem loans."

85.    However, other analysts believed Wilmington Trust's propaganda. For example, on July 26, 2010, RBC Capital Markets issued a research report stating that the Federal Reserve's safety and soundness examination of Wilmington Trust, which started that summer, is not likely to lead to a repeat of the second quarter losses in the third quarter, as the independent

consultant hired by the Company to evaluate its loan portfolio in June likely provided a comparable examination.

86.     On August 9, 2010, the Company filed its quarterly report for the second quarter 2010 on Form 10-Q with the SEC ("Second Quarter 2010 10-Q"), reporting substantially the same financial information as set forth in the same July 23, 2010 press release. The Second Quarter 2010 10-Q states that "[w]e maintain our accounting records and prepare our financial statements in accordance with U.S. generally accepted accounting principles (GAAP) and reporting practices prescribed for the banking industry." The Second Quarter 2010 10-Q includes certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Foley and Gibson, whereby each of the signatories certified to the same statements alleged in ¶ 32 above.

87.     The Second Quarter 2010 10-Q stated, in part, as follows:

As of June 30, 2010, we had a $238.4 million net deferred tax asset that we do not have a valuation allowance against because we believe that it is more likely than not that the deferred tax asset will be realized in the future. Although realization is not assured, we anticipate that realization of this asset will occur through a combination of significant loss carry-backs, reversal of taxable temporary differences, and future taxable earnings.

                          *          *          *

The primary cause of [the $116.4 million net loss] was the amount of the provision for loan losses, which was $205.2 million for the second quarter and $282.6 million for the first six months of 2010. The extent and duration of the recession continued to affect the credit quality of our loan portfolio. There were significant declines in collateral values and continued financial difficulty for many of our borrowers, particularly in southern Delaware. In response to these conditions, we reevaluated collateral values, obtained updated appraisals, refined our risk rating designations, and revised some of the credit quality factors on our performing portfolio. In total, lower collateral values, increased delinquencies, and the continued intensity of the recession caused increases in charge-offs, increases in non-accruing loans, internal risk rating downgrades, and the increase in our reserve for loan losses.

                          *          *          *

> The loan loss reserve and provision represent what we believe are reasonable assessments of our known, estimated, and inherent loan losses. . . .
>
> We believe our process provides a reasonable estimate of required reserves at each reporting date, and that our methodology is sound. . . .

88.     The statements referenced in ¶¶ 31-87 were materially false and/or misleading because, unknown to investors as alleged below, during the Class Period, Wilmington Trust knowingly or recklessly failed to disclose that (1) its loan portfolio was impaired to a much larger extent than the Company had disclosed, (2) the Company had failed to properly record losses for its impaired assets by adequately provisioning for loan losses each quarter in light of its known concentrations of loans in the commercial sector and in the struggling Delaware region, and that as result of the foregoing, (3) the Company's financial statements were materially false and misleading and not prepared in accordance with GAAP, including overstating the value of the Company's assets, understating its provisions for loan losses and understating the Company's income tax expense; and (4) Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and growth.

89.     On November 1, 2010, Wilmington Trust announced the merger with M&T, as well as the Company's third quarter 2010 results.  As noted above in ¶ 8, pursuant to the merger agreement executed by Wilmington Trust and M&T, M&T will acquire Wilmington Trust in a stock-for-stock exchange that values each Wilmington Trust share at a mere $3.84 per share.  On October 29, 2010, the last trading day before this announcement, Wilmington Trust shares closed at $7.11, making the merger price a 45.9% discount.

90.     That same day, Wilmington Trust issued a press release announcing its financial results for the quarter ended September 30, 2010, in which the Company reported a loss of $365.3 million, or $4.06 per share and explained that the primary causes of the loss were the

increased loan loss provision resulting from the Company's exposure to Delaware construction loans and the establishment of a valuation allowance on deferred tax assets:

**WILMINGTON, Del. -- November 01, 2010**

Wilmington Trust Corporation (NYSE: WL) reported a loss of $365.3 million for the 2010 third quarter. After dividends and accretion on preferred stock, the net loss available to common shareholders was $369.9 million, or $4.06 per share.

The primary causes of the loss were:

- Continued deterioration in commercial credit quality, which resulted in a loan loss provision of $281.5 million.
- Income tax expense of $100.7 million, as the company established a valuation allowance on deferred tax assets.

<p style="text-align:center">*     *     *</p>

"Our third quarter loss was primarily the result of two factors. First, we continued to see credit deterioration in our loan portfolio, reflecting the extent of our exposure to real estate construction lending and its concentration in Delaware. Second, our continued losses required us to establish a significant tax valuation allowance. The result of both of these developments was a loss that clearly exceeded our expectations," said Donald E. Foley, Wilmington Trust chairman and chief executive officer.

<p style="text-align:center">*     *     *</p>

- The effects of the protracted recessionary environment continued to pressure Delaware's economy. Commercial loan repayment problems intensified, appraisals continued to reflect additional declines in collateral valuations and the financial condition of more borrowers weakened. As a result, the amount of nonaccruing loans increased, and the risk ratings of more loans were downgraded to substandard status.

- Total nonperforming assets were $988.6 million, a 77% increase from the 2010 second (trailing) quarter. Total nonperforming assets reached 12.1% of total loans and other real estate owned (OREO).

- Loans with substandard risk ratings totaled $1.99 billion, a 37% increase from the trailing quarter.

- Due to the downgrades and the increase in nonaccruing loans, the provision for loan losses rose 37% from the trailing quarter to $281.5 million.

- The company added $136.6 million to the reserve for loan losses, which brought the reserve to $510.4 million, or 6.28% of total loans outstanding.

- As a result of the third quarter loss, the company set aside $189.5 million as a valuation allowance against its net deferred tax asset.

- As a result of the valuation allowance, income tax expense increased to $100.7 million.

<p style="text-align:center">*     *     *</p>

**INCOME TAXES AND DEFERRED TAX ASSET**

Continued net losses and uncertainty about how credit quality problems might affect the company's financial performance in the future led management to conclude that it was no longer more likely than not that a portion of the deferred tax asset would be realizable. To plan for this possibility, management established a valuation allowance of $189.5 million against the deferred tax asset. This caused income tax expense to increase in the 2010 third quarter.

91.     In a "Chairman's Bulletin" from Defendant Foley, attached to a second press release dated November 1, 2010, Foley tried to explain the rationale for the merger:

> I suspect that "why now?" is the key question that many of you may be asking. Given our 107-year history of independence, it is, of course, a fair one. The answer is that as the financial realities associated with the credit quality of our loan portfolio intensified, our losses increased. Although we are well capitalized today, loan losses have not slowed. As a result, we haven't been able to look to the future and believe with assurance that we could remain well capitalized indefinitely. With no meaningful economic recovery on the horizon, it became increasingly clear that we needed to explore all strategic alternatives. Fortunately, in M&T we found a like-minded partner and, as a result, we'll be able to move forward in serving our clients from a position of strength, as we have customarily been able to do.

92.     The Company also held a conference call on November 1, 2010 in which executives from both Wilmington Trust and M&T participated.  During the call, Defendant Foley claimed that "additional credit quality problems emerged during the quarter" which caused Wilmington Trust to increase its provision for loan losses by 37% from the prior quarter to $282 million.  Foley went on to admit that because the $265 million pre-tax loss for the quarter was the sixth consecutive quarter of losses, Wilmington Trust needed to establish a valuation

<p style="text-align:center">47</p>

allowance of $189 million against its deferred tax asset, which caused the company to record a

tax expense of $101 million for the quarter.  Defendant Foley further stated, in part, as follows in

an attempt to attribute the new disclosures regarding increased loan losses and the establishment

of the valuation allowance for the deferred tax asset on economic uncertainty and deterioration in

Delaware, although this was not a new trend:

> . . . The negative effects of the protracted recessionary environment in Delaware,
> and how these pressures are challenging the financial health of many of our
> borrowers, simply cannot be overstated. In the third quarter evidence mounted
> that things were getting worse for some of our borrowers, and even some of our
> strongest clients began to feel the pressure. The financial conditions of more of
> our borrowers weakened, their cash flows tightened, and appraisals continued to
> show significant declines in collateral valuation. These issues manifested
> themselves in our credit metrics to a significantly greater degree than in the
> second quarter.
>
> Geographically, the highest concentration of problem loans remained in southern
> Delaware, but there was also an increase in the percentage of problem loans in
> northern Delaware. Most of our credit problems continued to be in the
> commercial real estate construction portfolio, but we started to see problems
> spread to the commercial, financial, and agricultural portfolio in the third quarter.
> There is much more detail on credit quality in our press release.
>
> We have been working diligently over the past year to de-risk the portfolio. By
> the end of the third quarter we had evaluated more than 92% of our commercial
> real estate construction and mortgage loans and the trend line is not encouraging.
> *It appears to us that there is no significant economic or real estate recovery on*
> *the horizon.* This gives us little assurance that our loan portfolio will strengthen
> significantly in the near term, and that our capital position will not erode further.
> (Emphasis added.)
>
> These risks increase the possibility of downgrades by the credit rating agencies
> and adverse regulatory actions. Either, or both of which, could compromise the
> value of our franchise, particularly in our two fee-based businesses, which
> continue to perform well. They are established leaders in their markets and they
> have solid growth prospects. For all of these reasons, our board and management
> carefully studied Wilmington Trust's strategic options and we reviewed a wide
> range of alternatives. Ultimately, the board determined that the best option for our
> shareholders, as well as our clients and employees of Wilmington Trust, was a
> merger with M&T.

93.    Also during the November 1, 2010 conference call, in response to an analyst comment that "the magnitude of the increase in non-performers still was pretty surprising," Defendant Foley further stated, "[w]hat we saw was an acceleration in the deterioration of the credit quality of may of our customers over this quarter, received a lot in terms of the appraisal information that we gathered, all indicating that both the magnitude and the velocity of this credit deterioration was very significant for us."    Additionally, another analyst also commented on the shocking nature of the disclosures by stating:

> The loans – the construction loans' deterioration is no big surprise. But C&I, or CF&A [commercial, financial & agricultural] I guess as you guys put it, what's going on there? How come – I mean it's awfully late in the cycle to suddenly discover problems in that portfolio.

94.    As noted above in ¶ 9, the Company also discussed the merger, or takeunder by M&T, during the November 1, 2010 conference call and the rationale for agreeing to a transaction price that values Wilmington Trust shares at a mere $3.84 per share, about 54% of the per share value the day before the announcement.    The alarmingly low value of $3.84 per share, among other things, was the result of the $282 million loan loss provision, the new admission of the trend of losses that triggered the need for the Company to establish a valuation allowance of $189 million against its deferred tax asset, the fact that the estimated fair value mark for Wilmington Trust's loan portfolio was suddenly revealed to be only $1 billion, or 13% of loans, and the fact that M&T estimates an aggregate of $1 billion in future credit losses on Wilmington Trust's loan portfolio.

95.    On November 1, 2010, in an article entitled "Wilmington Trust Deal May Be a Sign of Trouble," the New York Times stated that:

> [T]he general impression was that while loan losses would hurt the bank for some time, Wilmington had taken its lumps at the end of the second quarter. No wonder, then, that its decision on Monday to sell to M&T for $351 million was

shocking. The price, a 45 percent discount to Friday's close, makes it one of the biggest so-called "take-unders" in recent Wall Street memory.

In reality, the valuation is not that bad given the bank's dismal third-quarter results. At around tangible book value, it is not that out of line with where healthier banks have been trading. But until the deal was announced, investors thought Wilmington's tangible book was worth twice as much.

What changed that was losses taken after the bank — under mounting pressure from regulators — reassessed its assumptions about its mortgage and construction loan book. Worryingly, these were mostly loans made in Wilmington's own backyard, where M&T guesses it could lose another $1 billion.

Wilmington was more exposed than most, with almost half its loans extended to construction and real estate. But that it only now, under new leadership and regulatory pressure, recognized that it was worth far less than previously thought could elicit concern that other banks have more dross on the books than they're letting on.

96.     In a November 2, 2010 article, "M&T To Acquire Ailing Wilmington Trust," the

Wall Street Journal explained that:

Industry analysts and investment bankers were puzzled by the magnitude of Wilmington Trust's deterioration, which was attributed to continued weakness in its construction-loan portfolio. The bank said Monday that it wrote off $145 million in bad loans in the third quarter, up from $22 million a year earlier. Nonperforming assets, mostly loans for which repayment is doubtful, rose 150% to almost $990 million. And the loan-loss provisions surged to $281.5 million from $38.7 million a year earlier.

People familiar with Wilmington Trust's strategy said the company had lent heavily to developers who were building homes in southern Delaware, particularly near beach communities that were expected to attract second-home buyers. Much of that anticipated demand evaporated.

97.     On November 1, 2010 following the Company's disclosures, the Wilmington

Trust's common stock price fell 41% to close at $4.21 on unusually high volume, and continued

to fall to $4.11 on November 2, 2010.

## ADDITIONAL SCIENTER ALLEGATIONS

98.     As alleged herein, the Wilmington Defendants acted with scienter in that

defendants knew that the public documents and statements issued or disseminated in the name of

the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Wilmington Defendants, by virtue of their receipt of information reflecting the true facts regarding Wilmington Trust, their control over, and/or receipt and/or modification of Wilmington Trust's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Wilmington Trust, participated in the fraudulent scheme alleged herein.

99.     The Wilmington Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Officer Defendants.

100.     The Wilmington Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Officer Defendants were the most senior officers of Wilmington Trust, issued statements and press releases on behalf of Wilmington Trust and had the opportunity to commit the fraud alleged herein.

### LOSS CAUSATION/ECONOMIC LOSS

101.     During the Class Period, as detailed herein, the Wilmington Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Wilmington Trust's stock price and operated as a fraud or deceit on Class Period purchasers of Wilmington

Trust's common stock by misrepresenting the Company's operating condition and future business prospects. The Wilmington Defendants achieved this by making positive statements about Wilmington Trust's business and financial results while they knew or recklessly disregarded that the Company was improperly provisioning and reserving for loan losses. Later, however, when the Company and the Individual Defendant's prior misrepresentations were disclosed and became apparent to the market, the price of Wilmington Trust's common stock fell precipitously as the prior artificial inflation came out of Wilmington Trust's stock price. As a result of their purchases of Wilmington Trust common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws.

## FRAUD ON THE MARKET

102.   At all relevant times, the market for Wilmington Trust's common stock was an efficient market for the following reasons, among others:

(a)   The Company's common stock was actively traded on the NYSE in a highly efficient market;

(b)   As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)   The Company was covered regularly by securities analysts; and

(d)   The Company regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

103.   As a result, the market for the Company's common stock promptly digested current information with respect to Wilmington Trust from all publicly available sources and

reflected such information in the price of the Company's securities. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the common stock of Wilmington Trust at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

104.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Wilmington Trust who knew that those statements were false when made.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against the Wilmington Defendants**

105.    Plaintiff incorporates ¶¶ 1-104 by reference.

106. During the Class Period, the Wilmington Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107. The Wilmington Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a) Employed devices, schemes and artifices to defraud;

    (b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

    (c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Wilmington Trust common stock during the Class Period.

108. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wilmington Trust's common stock. Plaintiff and the Class would not have purchased Wilmington Trust common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

109. As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Wilmington Trust common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Officer Defendants

110.    Plaintiff incorporates ¶¶ 1-104 by reference.

111.    The Officer Defendants acted as controlling persons of Wilmington Trust within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

112.    In particular, the Officer Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

113.    As set forth above, Wilmington Trust and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as a controlling person, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of

Wilmington Trust's and the Officer Defendants' wrongful conduct, plaintiffs and other

members of the Class suffered damages in connection with their purchases of the Company's

common stock during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a

proper class action; awarding damages, including interest; awarding reasonable costs, including

attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 10, 2010

RIGRODSKY & LONG, P.A.

By: _____
Seth D. Rigrodsky (#3147)
sdr@rigrodskylong.com
Brian D. Long (#4347)
bdl@rigrodskylong.com
919 N. Market Street, Suite 980
Wilmington, DE 19801
Tel.: (302) 295-5310
Fax: (302) 654-7530

KAPLAN FOX & KILSHEIMER LLP
Frederic S. Fox
ffox@kaplanfox.com
Pamela A. Mayer
pmayer@kaplanfox.com
Irina Kobylevsky
ikobylevsky@kaplanfox.com
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7714

*Counsel for Plaintiff*